**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 16-cv-00094-REB-MJW

WAHAN KRIKORIAN,
On behalf of the TPS Parking Management, LLC 401(k)
Plan and On Behalf of All Other Similarly Situated
Employee Benefit Plans,

      Plaintiff,

v.

GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY,
GREAT-WEST LIFE & ANNUITY INSURANCE
COMPANY OF NEW YORK, GREAT-WEST TRUST
COMPANY, LLC, and ADVISED ASSETS GROUP, LLC,
 collectively d/b/a EMPOWER RETIREMENT,

      Defendants.

_____

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

_____

## TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................................... 1

Background ...................................................................................................................... 3

      I.      The Department of Labor's Approval of Revenue Sharing. ...................... 3

Statement Of Undisputed Material Facts.......................................................................... 5

Statement of the Case..................................................................................................... 10

Argument......................................................................................................................... 10

      I.    The Department of Labor and The Courts have Held that Revenue
           Sharing Does Not Violate ERISA. ................................................................. 10

      II.  Great-West's Revenue Sharing Practices Do Not Violate ERISA. ............... 12

           A.   Great-West Uses Revenue Sharing to Offset Its Recordkeeping
                 Fee on a Dollar-for-Dollar Basis. ............................................................ 13

           B.   Great-West Plays No Role in Choosing the Funds in Which the
                 TPS Plan Participants May Invest. .......................................................... 14

      III. Because Great-West's Revenue Sharing Practices Do Not Violate
           ERISA, All of the Counts of the Complaint Fail. ........................................... 16

           A.   Count I................................................................................................... 16

           B.   Count II.................................................................................................. 16

           C.   Count III................................................................................................. 16

Conclusion ...................................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                               **Page(s)**

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
    474 F.3d 463 (7th Cir. 2007) ...................................................................................... 14

*Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
    302 F.3d 18 (2d Cir. 2002) ....................................................................................... 14

*Hecker v. Deere & Co.*,
    556 F.3d 575, 579 (7th Cir. 2009) ................................................................ 12, 14, 16

*Leimkuehler v. Am. United Life Ins. Co.*,
    713 F.3d 905 (7th Cir. 2013) .................................................................................... 12

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) ..................................................................................... 14

*Tibble v. Edison International*,
    729 F.3d 1110 (9th Cir. 2013), *reversed on other grounds by*, 135 S. Ct. 43
    (2014) ....................................................................................................................... 11

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir.), *cert. denied*, 135 S. Ct. 477 (2014) ................................... 11

*Whitton v. Deffenbaugh Disposal, Inc.*,
    No. 12-2247, 2015 U.S. Dist. LEXIS 20938 (D. Kan. Feb. 23, 2015) ...................... 14

**Other Authorities**

29 C.F.R. § 2550.404a-5 .............................................................................................. 11

29 C.F.R. § 2550.408b-2 ......................................................................................... 11, 14

75 Fed. Reg. 41600 ................................................................................................... 5, 14

75 Fed. Reg. 64910 ......................................................................................................... 5

DOL Advisory Op. 97-15A, 1997 WL 277980 (May 22, 1997) ............................... *passim*

DOL Advisory Op. 2003-09A, 2003 WL 21514170 (June 25, 2003) ...................... *passim*

Defendants Great-West Life & Annuity Insurance Company, Great-West Life & Annuity Insurance Company of New York, Great-West Trust Company, LLC, and Advised Assets Group, LLC (collectively "Great-West") hereby move for summary judgment in their favor on all of the claims asserted in the Complaint (Dkt. 1), because there is no genuine dispute of material fact that Great-West's revenue sharing practices do not violate ERISA.[1] Great-West requests oral argument on this motion.

## Introduction

The gravamen of this lawsuit is that Great-West violated ERISA by engaging in revenue sharing—a practice in which it receives payments from mutual funds as part of its compensation for providing plan services. The Complaint tries to make revenue sharing sound nefarious by calling the payments "kickbacks" and part of a "pay-to-play scheme." Compl. ¶ 4. But courts and the Department of Labor ("DOL")—the federal agency that administers ERISA—call it something else: legal and beneficial. This is because revenue sharing payments are not "kickbacks" or extra revenue; rather, Great-West (and most of its competitors) accept these payments—which are fully disclosed to employer plan sponsors—as one form of compensation for the services it provides to plans. In fact, many plan sponsors choose to use revenue sharing payments as a way to compensate recordkeeping service providers like Great-West for their services. Without these revenue sharing payments, these services would be paid for by the plan

---

[1] Plaintiff has sought leave to amend the Complaint to assert additional claims against Great-West, including a claim that Great-West charges excessive fees for its Managed Account service. *See* Dkt. 77. The Court has not yet ruled on Plaintiff's motion, and Great-West's motion for summary judgment therefore addresses only the claims that are presently before the Court. If the Court grants Plaintiff's motion to amend, Great-West reserves the right to file an additional summary judgment motion with respect to any new claims.

sponsor or the plan participants. As a result, the DOL observed a decade ago that revenue sharing "reduces overall plan costs and provides the plans, especially small ones, with services and benefits which might not be affordable."[2] Revenue sharing is so engrained in the fabric of the retirement plan services payment system that in 2012, the DOL enacted a regulation to ensure that such payments were disclosed in a specific manner—a regulation that would be needless if revenue sharing were unlawful.

Plaintiff also apparently contends that it is unlawful for Great-West to receive revenue sharing payments because it is an ERISA fiduciary. Great-West disputes that it acts as a fiduciary with respect to revenue sharing, but the Court need not resolve that dispute to grant this motion. The DOL has made clear that even fiduciaries can accept revenue sharing payments so long as two conditions are met: (1) the decision about whether to invest in a mutual fund that makes a revenue sharing payment is made by an entity other than the one receiving the revenue sharing payments from that mutual fund, and (2) those payments are used to benefit the plan, through either a credit or an offset to recordkeeping costs. Both conditions are satisfied here. As to the first, it is undisputed that the plan in which Plaintiff is a participant, the TPS Parking Management, LLC 401(k) Plan ("TPS Plan"), and its outside consultant chose all of the investment options for the TPS Plan; none were chosen by Great-West. As to the second, the evidence shows that Great-West gives a dollar-for-dollar credit to plans for expected revenue sharing payments, and there is no evidence to the contrary. Great-

---

[2] *See* Declaration of Daniel R. Thies ("Thies Decl.") Ex. 1, Advisory Council on Employee Welfare and Pension Benefit Plans, *Report of the Working Group on Fiduciary Responsibilities and Revenue Sharing Practices*, at 9 (2007).

West is thus entitled to summary judgment as to all of Plaintiff's claims, and this case should come to an end.

## Background

### I.      The Department of Labor's Approval of Revenue Sharing.

Revenue sharing is central to the provision of administrative services to 401(k) plans. Thies Decl. Ex. 3 ("Muir Expert Report") at 3. Retirement plan service providers like Great-West perform administrative services that facilitate participants' investments in mutual funds and other investments. In exchange for those services, some mutual fund companies pay the service providers to cover the cost of these services. *Id.* at 4-6. These services include providing "account statements, educational programs and materials, investment transactions, call centers, web sites, etc. that provide information and receive transaction orders, and processing of plan loans, distributions, roll-overs, contributions, and court orders to divide 401(k) plan accounts upon a participant's divorce, etc." *Id.* at 8.

Revenue sharing has existed since the 1990s. Shortly after the practice became more prevalent, the DOL addressed the legality of revenue sharing in a 1997 advisory opinion known as the "Frost Letter." DOL Advisory Op. 97-15A, 1997 WL 277980, at *3 (May 22, 1997). In the letter, Frost National Bank requested that the DOL provide an opinion on "whether the payment of certain fees by a mutual fund in which an employee pension benefit plan has invested to a bank serving as the plan's trustee would violate sections 406(b)(1) and 406(b)(3) of ERISA." *Id.* at *1. Frost represented that, like Great-West here, any revenue sharing it received would "be used to benefit the Plan,"

because "Frost will offset such fees, on a dollar-for-dollar basis, against the trustee fee that the Plan is obligated to pay Frost or against the recordkeeping fee that the Plan is obligated to pay to a third-party recordkeeper." *Id.* at *2. Under those circumstances, the DOL concluded that the revenue sharing did not violate ERISA's prohibited transaction rules, even though Frost acted as a fiduciary. *Id.*

The DOL again addressed the permissibility of revenue sharing in a 2003 advisory opinion known as the "ABN AMRO Letter." DOL Advisory Op. 2003-09A, 2003 WL 21514170 (June 25, 2003). That letter confirmed that revenue sharing, including revenue sharing received from mutual funds offered by an affiliate of the service provider (called "proprietary funds") does not violate ERISA so long as the decision to invest in the mutual funds is made by a plan fiduciary or participant other than the service provider receiving the revenue sharing. *Id.* at *6.

The DOL studied revenue sharing throughout the 2000s in a series of working groups, concluding in general that revenue sharing can reduce plan costs and allow for more services to be made available to smaller plans. Muir Expert Report at 5-6. "The [DOL's] view is that revenue sharing may be good, in that it reduces overall plan costs and provides the plans, especially small ones, with services and benefits which might not be affordable." *See* Thies Decl. Ex. 1 at 9. The same report noted "there was a considerable amount of consensus with respect to the concept of revenue sharing, how it can benefit plan sponsors and their participants." *Id.* at 3. As early as 2004, the DOL's ERISA Working Group wrote "that explicit charges in many plans have been substantially reduced or nearly completely eliminated" due to revenue sharing. Thies

Decl. Ex. 4, *Report of the Working Group on Plan Fees and Reporting on Form 5500* (2004) at 5; *see also* Muir Expert Report at 6.

At the conclusion of its studies, the DOL promulgated regulations to ensure that revenue sharing payments are disclosed to plans and participants in a specific manner. *Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure*, 75 Fed. Reg. 41600 (July 16, 2010) (to be codified at 29 CFR 2550.408b-2(c)) (plan-level disclosures); *Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans*, 75 Fed. Reg. 64910 (Oct. 20, 2010) (to be codified at 29 CFR 2550.404a-5) (participant level disclosures). The DOL recognized that revenue sharing payments "typically constitute a large portion of the total expenses incurred by a plan and its participants." 75 Fed. Reg. at 41611. As a result, the new rules were "intended to provide those participants in plans with revenue sharing arrangements that serve to reduce plan administrative costs with a better picture as to how those costs are underwritten, at least in part, by fees and expenses attendant with investment alternatives offered under their plans." 75 Fed. Reg. at 64913.

## Statement Of Undisputed Material Facts

For purposes of this motion, the following facts are undisputed:

1.     Defendant Great-West is a company that provides services to 401(k) retirement plans. Thies Decl. Ex. 5 ("McLeod Dep.") at 20:25-21:5, 22:20-23:10.

2.     Plaintiff is a participant in the TPS Plan. Compl. ¶ 13.

3.     The TPS Plan is a retirement plan that has contracted with Great-West to provide 401(k) plan services. *Id.*

4.      Great-West prices the services it provides to plans as a package and negotiates a single price with retirement plans. Dkt. 47 ("Moritz Decl.") ¶¶ 9-10. Revenue sharing payments from mutual funds offered by the plans are one means by which plans can pay for these services. Thies Decl. Ex. 6 ("Moritz Dep.") at 24:11-16, 26:7-10; Dkt. 42 ("Forde Decl.") ¶ 4; Moritz Decl. ¶ 9.

5.      Mutual fund companies that make revenue sharing payments pay Great-West from the expense ratio that the mutual fund charges to plan participants. Moritz Decl. ¶ 10; Moritz Dep. at 52:22-53:12.

6.      Great-West provides a dollar-for-dollar offset against the amount it needs to administer a plan based on its projection of the dollars it will receive from revenue sharing. Moritz Decl. ¶ 10; Moritz Dep. at 86:21-87:16. For example, "if Great-West projects it needs $100,000 per year to provide administrative services and projects it will receive $50,000 in revenue sharing [from plan investments,] then Great-West needs to receive only $50,000 from either the plan participants or the plan." Moritz Decl. ¶ 10; *see also* McLeod Dep. at 151:3-5 ("[A]ll revenue sharing is getting dollar-for-dollar credit into plan pricing[.]); *id.* at 151:9-15 ("[F]or the core market [plans included in the class] where revenue share is specifically and explicitly considered in the pricing model.").

7.      As part of the pricing process, "if a plan has funds with revenue share in it, that's a one-for-one credit to the plan as revenue, meaning there's more revenue [to] a plan [and] then there's less per part[icipant] or per plan charges for that plan. If there's less revenue shared by the funds, then there's obviously more paid by the participant of the plan." Moritz Dep. at 71:3-12; *see also* Moritz Decl. ¶ 10.

8.      The choice of whether to use revenue sharing to pay for Great-West's services is made by the plan sponsors, some of whom opt to use no revenue sharing, and others of whom opt to pay large portions of their fees with revenue sharing. Forde Decl. ¶ 8; Dkt. 45 ("Schegel Decl.") ¶¶ 7, 10-11; Dkt. 46 ("Waite Decl.") ¶¶ 6-8; Dkt. 43 ("Kunick Decl.") ¶¶ 5-7, 10.

9.      Great-West is indifferent as to the source of its revenue (i.e., whether it comes from revenue sharing payments or from payments from the plan sponsor or the participants), so long as the total price of the services is covered. Moritz Dep. at 33:21-34:9; Forde Decl. ¶ 9; Kunick Decl. ¶ 7; Schlegel Decl. ¶ 7; Waite Decl. ¶ 5; Dkt. 44 ("McGibbon Decl.") ¶ 8. Thomas Fay, the TPS Plan's independent investment advisor, confirmed his understanding that Great-West is indifferent to revenue sources. Thies Decl. Ex. 7 ("Fay Dep.") at 93:15-23.

10.     The TPS Plan has used revenue sharing to pay a portion of the fees it owes to Great-West each year from 2010-2016. *See* Thies Decl. Ex. 8 at Interrog. Resp. No. 2 & Ex. 2; McLeod Dep. at 154:2-5. The officials who administer the TPS Plan were fully aware of this fact. *See* Fay Dep. at 73:6-14, 91:12-92:17; Thies Decl. Ex. 9 ("Ruberry Dep.") at 22:16-23:7, 98:13-99:12.

11.     If a plan opts to use revenue sharing, it must determine which investment options to offer to its participants, taking care to select investment options that include a revenue sharing option. McGibbon Decl. ¶ 13; Waite Decl. ¶ 10; Schlegel Decl. ¶ 14.

12.     The final decision on which investment options are selected for a plan rests with the plan sponsor and its advisors, not with Great-West. McGibbon Decl. ¶ 13;

Waite Decl. ¶ 10; Schlegel Decl. ¶ 14; *see also* Declaration of Kathy Dunn ("Dunn Decl.") Ex. 1 (minutes of meeting with TPS Plan trustees stating that "Great-West requires [your approval] in writing to proceed with any changes").

13.     To ensure that it is clear to plans that they, and not Great-West, make the final determination about which funds to offer, Great-West requires a plan to sign a letter of direction whenever it opts to offer a new fund, in which the plan "certifies it has requested and authorizes the proposed fund changes." Dunn Decl. Ex. 3 at GWLA_0016118.

14.     The TPS Plan chose to receive services by enrolling in Great-West's "Custom Key" platform. The Custom Key product allows a plan to offer any of more than 13,000 investment options to its plan participants. McLeod Dep. at 108:11-24; Dunn Decl. Ex. 2.

15.     The TPS Plan signed a mutual fund change letter acknowledging that it was responsible for fund selection each time it opted to change its investment lineup during the class period. *See* Dunn Decl. Exs. 4-6.

16.     Thomas Fay and Jill Tsuji, the TPS Plan's independent third-party investment advisors, testified that the TPS Plan had sole control over what investment options it offered to participants. In particular, Fay testified that the "final decision" about what funds to offer always "lay with the [TPS Plan] Investment Committee," Fay Dep. at 95:1-6, that Great-West provided fund options to the TPS Plan based on what the TPS Plan wanted, *id.* at 96:10-97:7, and that Great-West never changes any of the TPS Plan investment options on its own, *id.* at 113:7-15. Tsuji similarly testified that Great-West

suggested to the TPS Plan the funds that matched what the TPS Plan wanted, that the TPS Plan was free to ask for other options if it did not like those suggestions, and that the final decision of what funds to offer rested with the TPS Plan. Thies Decl. Ex. 10 ("Tsuji Dep.") at 20:5-21:3.

17.     Mary Ruberry, one of the TPS Plan's trustees, similarly testified that the TPS Plan had sole control over what investment options it offered to participants. Ruberry testified that Great-West never told her that the TPS Plan could not consider a certain investment option. Ruberry Dep. at 32:20-24, 51:19-24. She also testified that the Plan would "ultimately—or potentially make decisions to change funds based on various options laid out to us" by their third-party investment advisor, *id.* at 64:9-24, that the TPS Plan makes the final decision about which funds to offer, *id.* at 65:3-19, 87:3-16, and that Great-West never did anything to change a fund without a written direction from the TPS Plan trustees, *id.* at 88:8-89:6.

18.     Great-West discloses in writing the revenue sharing payments that it expects to receive from mutual funds as part of the fee proposals it presents to plans before they contract with Great-West. *See* Dkt. 54-1(Moritz Decl. Ex. F); *see also* Moritz Decl. ¶ 30.

19.     After a plan contracts with Great-West, Great-West provides monthly disclosures to plans listing the revenue sharing amounts that it has collected. *See* Dunn Decl. Ex. 7 at GWLA_0007716-18; *id.* Ex. 8 at GWLA_0007748-50; *id.* Ex. 9 at GWLA_0007000-02; *id.* Ex. 10 at GWLA_0007579-81; See Dkt. 48-1, Moritz Decl. Ex. A at GWLA_0007526-28; Dkt. 48-2, Moritz Decl. Ex. B at GWLA_0007716-18; Dkt. 48-3,

Moritz Decl. Ex. C at GWLA_0006860-62; Dkt. 48-4, Moritz Decl. Ex. D at GWLA_0007886-88; Dkt. 48-5, Moritz Decl. Ex. E at GWLA_0007579-81.

20.     After a plan contracts with Great-West, Great-West provides monthly disclosures to participants disclosing that Great-West receives revenue sharing payments from mutual funds. Dunn Decl. Ex. 11 at GWLA_0007842 ("Part of these [mutual fund] expenses may be shared with the retirement provider to help pay for recordkeeping fees."); *see also id*. Ex. 12 at GWLA_0007176; *id*. Ex. 13 at GWLA_0007215; *id*. Ex. 14 at GWLA_0007642.

### Statement of the Case

On January 14, 2016, Plaintiff filed a putative class action complaint alleging that Great-West violated its fiduciary duties under ERISA and engaged in prohibited transactions through the services it provides to the TPS Plan, in which Plaintiff is a participant. Dkt. 1. Plaintiff alleges that Great-West is a fiduciary of the Plan and violated its fiduciary duties under ERISA by entering into revenue sharing agreements with various mutual funds offered to participants in the Plan. Plaintiff alleges that the revenue sharing payments Great-West received violated its fiduciary duties and constituted prohibited transactions.

### Argument

**I.     The Department of Labor and The Courts have Held that Revenue Sharing Does Not Violate ERISA.**

As explained above, the DOL has stated that revenue sharing does not violate ERISA in two separate advisory letters. Frost Letter, 1997 WL 277980; ABN AMRO Letter, 2003 WL 21514170. It has also studied the issue extensively in numerous

working groups, and has promulgated regulations implicitly approving of the practice by requiring disclosure of revenue sharing amounts. *See* 29 C.F.R. § 2550.404a-5(c)(2)(B)(ii)(C) (requiring disclosure to *participants* when "some of the plan's administrative expenses for the preceding quarter were paid from the total annual operating expenses of one or more of the plan's designated investment alternatives (e.g., through revenue sharing arrangements . . . )"); 29 C.F.R. § 2550.408b-2(c)(1)(iv)(C)(2) (requiring disclosure to *plans* of "all indirect compensation . . . that the covered service provider . . . expects to receive in connection with the services [provided]").

Numerous courts have held that revenue sharing is permissible. In *Tussey v. ABB, Inc.*, the court held that revenue sharing did not violate ERISA because it was a "common and 'acceptable' investment industry practice[] that frequently inure[s] to the benefit of ERISA plans." 746 F.3d 327, 336 (8th Cir.), *cert. denied*, 135 S. Ct. 477 (2014).[3] Similarly, in *Tibble v. Edison International*, the court held that "we are satisfied that revenue sharing as carried out by Edison does not violate ERISA." 729 F.3d 1110, 1131 (9th Cir. 2013), *reversed on other grounds by*, 135 S. Ct. 43 (2014).

Other appellate courts have reached a similar conclusion. In *Hecker v. Deere & Co.*, the plaintiffs alleged that the provider of the mutual funds offered in the 401(k) plan "maintains an active Revenue Sharing program, charging more for its services than it expects to keep in order to have additional monies with which to pay its affiliates and

---

[3] The *Tussey* court held that the plan sponsor nonetheless breached its fiduciary duty under the facts of that particular case because it failed to ensure that the fees the plan was paying were competitive, and because it may have been using revenue sharing payments to subsidize "corporate services" unrelated to the retirement plan. *Id.* Neither of those factors is relevant here.

business partners." 556 F.3d 575, 579 (7th Cir. 2009). The Seventh Circuit affirmed the

dismissal of plaintiffs' claim because their "case depends on the proposition that there is

something wrong, for ERISA purposes, in that arrangement," and the Seventh Circuit

found nothing in ERISA prohibiting revenue sharing. *Id.* at 585. In a later decision, the

Seventh Circuit again noted that revenue sharing, a "practice [that] has been

commonplace for years," did not violate ERISA because the recordkeeper was not a

fiduciary of the plan for purposes of accepting revenue sharing payments. *See*

*Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907-08 (7th Cir. 2013).

## II.   Great-West's Revenue Sharing Practices Do Not Violate ERISA.

Plaintiff appears to allege that Great-West cannot accept revenue sharing

payments because it acts as a fiduciary to the TPS Plan. Great-West disputes that

assertion, but it does not matter to the outcome of this motion, because even assuming

Great-West is a fiduciary, it is permitted to receive revenue sharing payments. Indeed,

in the advisory opinions cited above, the DOL found that entities that were fiduciaries

did not engage in prohibited transactions by accepting revenue sharing payments.

The DOL held that even fiduciaries can accept revenue sharing payments

provided two conditions are met. First, the service provider must "offset such [revenue

sharing] fees, on a dollar-for-dollar basis, against the trustee fee that the Plan is

obligated to pay" to the service provider. Frost Letter, 1997 WL 277980, at *2. Second,

the decision to invest in revenue-sharing mutual funds must be made by a plan fiduciary

or participant other than the recipient of the revenue sharing. ABN AMRO Letter, 2003

WL 21514170, at *4; *see also* Frost Letter, 1997 WL 277980, at *3 ("[I]t is generally the

view of the Department that if a trustee acts pursuant to a direction . . . and does not

exercise any authority or control to cause a plan to invest in a mutual fund, the mere

receipt by the trustee of a fee or other compensation from the mutual fund in connection

with the investment would not in and of itself violate section 406(b)(3)."). There is no

genuine dispute of material fact that Great-West satisfies both of these requirements.

### A.    Great-West Uses Revenue Sharing to Offset Its Recordkeeping Fee on a Dollar-for-Dollar Basis.

Extensive and undisputed evidence shows that Great-West offsets the revenue

sharing it expects to receive from mutual funds to defray a plan's recordkeeping

expenses on a dollar-for-dollar basis, thus satisfying the first condition. *See* McLeod

Dep. at 151:3-15; Moritz Dep. at 71:3-12; Moritz Decl. ¶ 10. There is no evidence to the

contrary.

Nor does the fact that Great-West credits plans with the revenue sharing it

expects to receive on a prospective basis make any difference to the outcome. *See*

Moritz Decl. ¶ 18 (explaining that the amount of the offset is based on projections).

Nothing in the DOL's guidance indicates that the dollar-for-dollar crediting cannot occur

based on projections of the amount of revenue sharing the service provider will receive.

In fact, in the ABN AMRO letter, the DOL specifically found that a service provider that

based its offset on estimates of expected revenue sharing payments did not engage in

any prohibited transactions. ABN AMRO Letter, 2003 WL 21514170, at *11.

Although Plaintiff contends that revenue sharing allows Great-West to control its

own compensation, that claim is demonstrably false. Great-West has no control over

*either* the mutual funds that the TPS Plan chose to offer (see below) or how participants

allocate their assets among those funds, so using a projection does not allow Great-West to control its own compensation. *See Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011); *Hecker*, 556 F.3d at 583; *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 473-75 (7th Cir. 2007); *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 29-30 (2d Cir. 2002). In fact, the DOL's regulation that requires disclosure of revenue sharing payments recognizes that such payments often must be estimated in advance precisely because of this uncertainty about how much plan participants, in their discretion, will invest in any particular mutual fund. 29 C.F.R. § 2550.408b-2(c)(1)(D)(2) (requiring disclosure of only "a reasonable and good faith estimate of the cost to the covered plan of such recordkeeping services" left after deducting revenue sharing). The DOL's commentary accompanying the rule recognizes the common industry practice of estimating future revenue sharing payments, indicating that the DOL adopted this provision "to accommodate industry variation in how recordkeeping costs are otherwise absorbed by plan service providers and investment-level charges." 75 Fed. Reg. 41600, 41610-11.

## B.   Great-West Plays No Role in Choosing the Funds in Which the TPS Plan Participants May Invest.

The undisputed evidence also shows that Great-West satisfies the second condition because it plays no role in choosing the mutual funds that the TPS Plan offered to its participants. Although the Complaint alleges that Great-West controls the menu of mutual funds available to plans, *see, e.g.* Compl. ¶ 55, 73-75, the undisputed evidence shows that none of these allegations are true as to the TPS Plan. *See Whitton v. Deffenbaugh Disposal, Inc.*, No. 12-2247, 2015 U.S. Dist. LEXIS 20938, at *12-13 (D.

Kan. Feb. 23, 2015) (in class action, court may consider "only [the named Plaintiff's] actions or knowledge" when evaluating motion for summary judgment).

The TPS Plan chose the mutual funds it offered to its plan participants from Great-West's "Custom Key" platform. *See* Dunn Decl. Ex. 2. Plans on that platform can offer any one of more than 13,000 investment options, without restriction, representing essentially all of the mutual funds available in the retirement marketplace. McLeod Dep. at 108:11-24. Great-West plays no role in adding or subtracting options from this list of available funds; instead, it changes the list only if there is a fund termination, a merger, the creation of new funds, or similar events. *Id.* at 108:25-109:22. It is the sponsor of the TPS Plan and its advisor that chose the mutual funds that were offered to TPS Plan participants. Fay Dep. at 95:1-6, 96:10-97:7,113:7-15; Tsuji Dep. at 20:5-21:3; Ruberry Dep. at 32:20-24, 51:19-24, 64:9-65:19, 87:3-16, 88:8-89:6. Every time the TPS Plan changed the menu of mutual funds available to plan participants, the change was made at the behest and direction of the plan sponsor and its consultant. *See* Dunn Decl. Exs. 4-6. Indeed, every time the TPS Plan made a change to the menu of mutual funds, the plan sponsor sent Great-West a mutual fund change letter directing Great-West to change the investment options and acknowledging that the TPS Plan alone was responsible for fund selection. *See id*.

Given these facts, Plaintiff can present no evidence creating a genuine dispute as to whether Great-West had any role in selection of the funds made available to the TPS Plan. Summary judgment in favor of Great-West is appropriate.

III.   **Because Great-West's Revenue Sharing Practices Do Not Violate ERISA, All of the Counts of the Complaint Fail.**

In sum, Great-West's revenue sharing practices do not violate ERISA, and thus Great-West is entitled to summary judgment on Counts I-III of the Complaint, all of which rely on an allegation that revenue sharing is improper.

A.   **Count I.**

Count I alleges that Great-West engaged in a prohibited transaction under ERISA, and thus breached its fiduciary duties, by accepting revenue sharing payments as part of its compensation. Compl. ¶ 105. But as outlined above, a service provider does not engage in a prohibited transaction when it accepts revenue sharing payments provided it complies with the terms of the Frost Letter, as Great-West does. Frost Letter, 1997 WL 277980. Count I thus fails.

B.   **Count II.**

Count II alleges that Great-West breached its fiduciary duties by accepting revenue sharing payments insofar as its decision to do so constituted a violation of its duty of prudence. Compl. ¶ 116. But if accepting revenue sharing payments is not self-dealing and does not violate ERISA, then arranging for revenue sharing is not imprudent either. *See Hecker,* 556 F.3d at 585. Plaintiff can present no other evidence of imprudence, so Count II fails as well.

C.   **Count III.**

Count III alleges that, if Great-West is not a fiduciary, it can still be liable as a knowing participant in a breach of fiduciary duty committed by other fiduciaries. But for the reasons stated above, Plaintiff cannot present any evidence that any fiduciary

engaged in a fiduciary breach by arranging for revenue sharing payments. Moreover,

because Great-West is not contesting that it is a fiduciary for purposes of this motion,

Count III's alternative allegations do not even come into play. Count III thus fails as well.

### Conclusion

For the reasons listed above, this Court should grant summary judgment in favor

of Great-West on all counts of Plaintiff's Complaint.


DATED: December 30, 2016                    SIDLEY AUSTIN LLP


                                            /s/ Daniel R. Thies_____
                                            Joel S. Feldman
                                            Mark B. Blocker
                                            Daniel R. Thies
                                            SIDLEY AUSTIN LLP
                                            One South Dearborn
                                            Chicago, Illinois 60603
                                            Telephone: (312) 853-2030
                                            Facsimile: (312) 853-7036
                                            Email: jfeldman@sidley.com
                                                     mblocker @sidley.com
                                                     dthies@sidley.com

                                            Edward C. Stewart, #23834
                                            WHEELER TRIGG O'DONNELL LLP
                                            370 Seventeenth Street, Suite 4500
                                            Denver, Colorado 80202-5647
                                            Telephone: (303) 244-1800
                                            Facsimile: (303) 244-1879
                                            Email: stewart@wtotrial.com

                                            *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 30, 2016, a copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which will send notification to the following:

James E. Miller
Laurie Rubinow
SHEPHERD FINKELMAN MILLER &
SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
     lrubinow@sfmslaw.com

Kolin C. Tang
SHEPHERD FINKELMAN MILLER &
SHAH, LLP
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 429-5272
Facsimile: (866) 300-7367
Email: ktang@sfmslaw.com

_s/ Daniel R. Thies_
Daniel R. Thies